NOTICE:  NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

BRIAN THIENES, an individual; JOHN BALL and MONICA BALL,
husband and wife; THE THOMPSON FAMILY TRUST; JUAN
BRACAMONTE and JACQUELINE BRACAMONTE, husband and wife,
*Plaintiffs/Appellees*,

*v.*

CITY CENTER EXECUTIVE PLAZA, LLC; INFORMATION SOLUTIONS,
INC.; and JERRY and CINDY ALDRIDGE, *Defendants/Appellants*.

CITY CENTER EXECUTIVE PLAZA, LLC, *Plaintiff/Appellant*,

*v.*

THE REFUGE COMMUNITY ASSOCIATION, INC., *Defendant/Appellee*.

No. 1 CA-CV 14-0077
1 CA-CV 14-0264
(Consolidated)
FILED 9-22-2016

Appeal from the Superior Court in Mohave County
No.  S8015CV201001563
The Honorable Lee F. Jantzen, Judge

**AFFIRMED IN PART; VACATED IN PART; REMANDED**

COUNSEL

Beus Gilbert P.L.L.C., Phoenix
By Franklyn D. Jeans, Cory L. Broadbent, Lyn Anne Bailey, Cassandra H. Ayres
*Counsel for Plaintiffs/Appellees Thienes, et al.*

Perkins Coie, L.L.P., Phoenix
By Daniel C. Barr, James A. Ahlers, Joshua M. Crum, John H. Gray, Alexander W. Samuels
*Counsel for Defendants/Appellants & Plaintiff/Appellant City Center Executive Plaza, L.L.C., et al.*

Maxwell & Morgan, P.C., Mesa
By Penny L. Koepke, Nicole A. Miller
*Co-counsel for Defendant/Appellee The Refuge Community Association, Inc.*

Houser & Allison A.P.C., Phoenix
By Solomon S. Krotzer
*Co-counsel for Defendant/Appellee The Refuge Community Association, Inc.*

Carpenter Hazlewood Delgado & Bolen, P.L.C., Tempe
By Edith I. Rudder
*Co-counsel for Defendant/Appellee The Refuge Community Association, Inc.*

Manning & Kass Ellrod, Ramirez, Trester, LLP., Phoenix
By Richard V. Mack
*Counsel for Amicus Curiae* National Association of Realtors and Arizona Association of Realtors

Arizona Association of Realtors, Phoenix
By K. Michelle Lind, Scott M. Drucker
*Counsel for Amicus Curiae* Arizona Association of Realtors

—————————————————

**MEMORANDUM DECISION**

—————————————————

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Kent E. Cattani and Judge Peter B. Swann joined.

—————————————————

**W I N T H R O P**, Judge:

¶1    In this consolidated appeal, we consider a series of jury verdicts and rulings by the trial court that culminated in three injunctions and a significant award of attorneys' fees and costs. City Center Executive Plaza, L.L.C. ("City Center"), Information Solutions, Inc. ("Information Solutions"), and Jerry and Cindy Aldridge ("the Aldridges")[1] (collectively, "Appellants") appeal the trial court's orders enjoining them (1) from further use of "Golf Course Facilities Easements" for anything other than golf or golf-related facilities, (2) from further use of "Declarant's Easements" for anything other than selling or marketing lots within the gated residential community known as The Refuge at Lake Havasu ("The Refuge"), and (3) against further use and development of a recreational vehicle park ("the RV Park") within the community.

¶2    The underlying case in this appeal arose when a group of lot owners within The Refuge ("the Thienes Plaintiffs")[2] sued Appellants after Appellants purchased the interlocking eighteen-hole championship Arnold Palmer Signature Golf Course ("the golf course"), made aggressive redevelopment plans, and began carrying out those plans to (1) significantly reduce the size of the golf course, (2) put in a permanent pavilion tent ("the Event Tent") near the golf course's clubhouse to host public events,[3] and (3) build a high-end motor coach or RV Park with related amenities to attract visitors to the area. During Appellants' efforts to carry out their redevelopment, members of The Refuge Community Association, Inc. ("the Association")[4] attempted to enforce the Association's

---

[1]    The Aldridges are the controlling owners and managers/principals/directors/officers of City Center and Information Solutions.

[2]    The Thienes Plaintiffs are Brian Thienes, John and Monica Ball, the Thompson Family Trust, and Juan and Jacqueline Bracamonte.

[3]    The Event Tent is a large, permanent structure capable of being opened to accommodate various events, including outdoor concerts.

[4]    The Association is the homeowners' association for The Refuge, and is responsible for enforcing the Association's Amended and Restated Declaration of Covenants, Conditions, and Restrictions ("CC&Rs"), and maintaining the common areas, including the roads within The Refuge, which are owned by the Association. Members of the Association own lots

CC&Rs, leading to conflicts between Appellants and the Association. Those conflicts formed the basis of a lawsuit filed by Appellants against the Association and other individual defendants, and counterclaims made by the Association against Appellants. The lawsuits were consolidated, and the matter was tried before a jury, which decided the majority of the issues in favor of Appellees.[5] After consideration, the trial court agreed with and adopted the jury's verdicts and issued the aforementioned injunctions.

¶3 Appellants maintain the permanent injunctions prohibit them from non-golf uses of the property they purchased, and argue the only notice they had of an alleged golf-only restriction when they purchased the property was the presence of the original championship golf course covering the property. They argue the trial court erred in shutting down a vital portion of their business based on a restriction they did not and could not have known about, and also erred in awarding substantial attorneys' fees and costs to Appellees. At the heart of this appeal is the question whether Appellants' use and development of an RV Park in the midst of Appellees' golf course community may be properly enjoined. For the following reasons, we affirm the injunctions, but we vacate the court's awards of costs and attorneys' fees, and remand for a recalculation of the awards.

## FACTUAL AND PROCEDURAL HISTORY[6]

I. *Factual History*

A. *Development of The Refuge*

¶4 The Refuge is a master-planned community in Mohave County ("the County"), consisting of 360 individual home sites built around or near the privately owned golf course at issue in this case.

---

in the Refuge, and its affairs are governed by a volunteer Board of Directors elected by the Association's members.

[5] We refer to the Thienes Plaintiffs and the Association collectively as "Appellees" or "Plaintiffs."

[6] We view the facts and reasonable inferences therefrom in the light most favorable to upholding the judgments. *See IB Prop. Holdings, L.L.C. v. Rancho Del Mar Apartments Ltd. P'ship*, 228 Ariz. 61, 63, ¶ 2, 263 P.3d 69, 71 (App. 2011).

Originally known as "The Cliffs at Lake Havasu," The Refuge was conceived and developed by Zenn LHC, LLC ("Zenn"), an Arizona-based subsidiary of Sienna Corporation ("Sienna").[7]

¶5        Sienna, through Zenn, began developing The Refuge in 2001. On December 3, 2001, the County rezoned the property for The Refuge,[8] and on May 14, 2002, Zenn obtained a loan from Home Federal Savings Bank ("Home Federal") and executed a Deed of Trust in favor of Home Federal for Zenn's property in The Refuge.

¶6        Sienna chose to develop The Refuge because of its proximity to Lake Havasu and the Havasu National Wildlife Refuge, and because Sienna believed views of the area would result in a beautiful golf course community. The golf course was the centerpiece, weaving throughout the subdivision; approximately one hundred of the residential lots abutted the golf course and more than eighty percent of the lots had favorable views. Although The Refuge Golf Course and Country Club is private property and not part of the common areas of The Refuge, it was built in conjunction with the community, and Sienna added the Arnold Palmer-designed golf course to The Refuge because applying Arnold Palmer's name to the golf course increased the marketability and value of the lots within The Refuge.[9]

---

[7]        One of Sienna's principals is John Hankinson. Hankinson was integrally involved in the original planning and development of The Refuge community and golf course, and he testified extensively at trial regarding the community's development. According to Hankinson, Sienna never intended an RV Park or Event Tent to be built in the Refuge, as neither is considered a golf club-related facility. Further, Sienna never envisioned the golf course being used for or converted to any other purpose, and intended the golf course to stay there forever.

[8]        Because the County did not have a golf course-only zoning designation, the golf course property was zoned C-RE (Commercial Recreation), a classification that permits several types of uses, including RV parks and golf courses. Nonetheless, Hankinson testified and the trial court found that if there had been a golf course-only zoning designation, Sienna would have utilized this zoning for the golf course.

[9]        The Refuge Golf Club, Inc.'s Membership Plan and Offering Circular provided that Zenn was to turn over control and management of the golf club to a board of directors selected by the golf members no later than

### B. Agreements with Mohave County

**¶7** Meanwhile, as part of The Refuge's development, Sienna submitted applications to the County for approval.[10] The County placed conditions on its approval of the development. One condition included Sienna establishing a conservation easement for the golf course to ensure the durability of that feature of the subdivision.[11] Sienna, however, had expressed concerns about the impact a conservation easement would have on its ability to obtain financing for The Refuge. In lieu of a conservation easement, Sienna and the County agreed to restrict the uses of the golf course via designations on the Final Plat and via the County's Resolutions approving development of The Refuge. In its Resolutions, the County noted the central feature of the subdivision is an "18-hole professional golf course and clubhouse" and provided that lots within the Final Plat could not be further divided.

**¶8** On September 24, 2002, the County approved the Final Plat for The Refuge. In the recorded Final Plat, approved uses for each parcel were identified. The County and Sienna agreed that the parcels, including those designated as "golf course/drainage easement" would be limited to golf course uses. The Final Plat also provided for the roads and "common areas" that the Association owns, manages, and maintains.

### C. The CC&Rs

**¶9** Also on September 24, 2002, Zenn recorded the original CC&Rs as part of the development of the Refuge.[12] The CC&Rs set forth the rights, responsibilities, and obligations of the "Declarant," "Golf Club

---

within thirty days of the earlier of (1) sale of all 362 golf memberships or (2) September 1, 2012.

[10] Sienna used local engineers and contractors, including A&N West, to develop The Refuge. A&N West was responsible for interacting and interfacing with the County on behalf of Sienna.

[11] The County wanted protections to ensure the longevity of the golf course, in part because it was aware of a golf course in another county that had gone into bankruptcy, leading to a dispute regarding redevelopment of that golf course.

[12] The original CC&Rs were amended and restated by Zenn on September 16 and December 31, 2008.

Owner," the "Association," and the lot owners ("Members"), and define those terms. As the original developer of The Refuge, Zenn was the original Declarant under the CC&Rs. In part, the CC&Rs state that the Golf Club Facilities are not common areas and are not subject to the CC&Rs, and lot owners have no ownership interest in or right to use the golf course. The CC&Rs also provide limited easements for "Golf Club Facilities" and the Declarant.

### D. *Promises Made to Purchasers of Property in The Refuge*

¶10 Sales materials for The Refuge reflected that its centerpiece was a "masterfully designed Arnold Palmer Signature Golf Course." Sienna provided lot purchasers at The Refuge, including the Thienes Plaintiffs, a map of the community, which showed the layout of the golf course, the subdivision, the streets, the 360 individual lots surrounding the golf course, and open spaces in the community. Sienna also presented as part of its sales materials a diorama of the community, which also showed the 360 individual lots, the golf course layout, the clubhouse, the streets, and open spaces. Additionally, Sienna leased a billboard in Lake Havasu City, on which it advertised Arnold Palmer and the golf course. Further, as part of its development of The Refuge, Sienna prepared a Subdivision Public Report for the Arizona Department of Real Estate ("the public report"). *See* Ariz. Rev. Stat. ("A.R.S.") § 32-2183 (Supp. 2015).[13] The public report reflects the community is a master-planned community developed pursuant to a common scheme, and references the golf course.

¶11 Salespersons encouraged prospective lot buyers to rely on the sales materials, the map of the community, the diorama of the development, the billboard, the public report, and other materials presented to them, all of which suggested the golf course would remain in its designated and platted state.

### E. *The Lot Purchase Contracts*

¶12 Buyers of lots at The Refuge signed purchase contracts requiring that the buyer receive, read, and understand numerous documents, including but not limited to the purchase contract, the public report, the golf course "Club Offering Circular," and the applicable recorded Final Plat. Buyers also received copies of the CC&Rs and agreed to be bound by them. With regard to the community's master plan, the

---

[13] We cite the current version of all statutes unless changes material to our decision have occurred since the relevant dates.

purchase contracts contained disclaimers warning that "[t]he only representations by [Zenn], its employees, or agents are set forth herein," "the master plan is subject to change," and "future circumstances could prevent the construction or operation of one or more of the planned amenities."

¶13 With regard to the golf course and related clubhouse facilities, the purchase contracts provided that Zenn "is the owner of and will be operating a golf club with related clubhouse facilities in the Refuge project." The contracts further noted that the golf club "is a private club which is not a part of the common areas of the Refuge development," and warned that lots located adjacent to the golf club "may be subject to additional noise, reduced privacy and other related impacts."

¶14 Additionally, the contracts warned that oral representations could not be relied upon, stating that "[n]o salesperson, employee or agent of [Zenn] has authority to make any other representations to Buyer that are not signed by [Zenn] or to modify the terms of this Purchase Contract or any other written agreement signed by [Zenn]."

¶15 Between 2003 and 2008, each of the Thienes Plaintiffs purchased one or more lots at The Refuge. Before purchasing their lots, the Thienes Plaintiffs reviewed the community's CC&Rs. The Thienes Plaintiffs construed the language of the CC&Rs to mean that RVs were not permitted in The Refuge, and that the golf course was protected and would remain in its designed and platted state. The Thienes Plaintiffs paid a higher price for their lots in The Refuge because of the inclusion of the Arnold Palmer Signature Golf Course in the community and because of the proximity of their property to the golf course.

### F. Golf Course Difficulties and Appellants' Interest

¶16 By 2008, all of the community infrastructure was complete, amenities for the residents were built, all lots in The Refuge had utilities to the lot lines, the lots were graded, and homes could be built on them. On December 31, 2008, pursuant to ¶ 1.46 of the CC&Rs, Sienna/Zenn voluntarily transitioned control of the Association to The Refuge property owners, who took over control of the community's operations.[14]

---

[14] In the planned community industry, a developer's main objective is to build out the community and sell lots or homes. Generally, once the majority of lots are sold, the developer turns control of the community's

**¶17** Zenn had anticipated limiting the total golf memberships to 362; however, membership in the golf course never exceeded ninety-four members, and the course consistently lost more than $1 million annually. Zenn eventually defaulted on its loan, and the golf course and the remaining lots owned by Zenn were noticed for a trustee's sale in May 2009, with a foreclosure date of August 5, 2009.

**¶18** The Aldridges knew the golf club was to be turned over to its members by a date certain; nonetheless, in July 2009, through City Center, they entered discussions with Zenn to acquire the golf course and country club property.[15] Zenn and City Center signed a purchase agreement; however, the purchase was not completed.

**¶19** On August 4, 2009, Sienna/Zenn assigned its Declarant rights to Home Federal.[16] On August 6, Home Federal foreclosed and purchased via credit bid the real property owned by Zenn, which included the golf course property and twenty-four home lots within the Refuge. Home Federal did not operate the golf course during its brief ownership.

---

operations over to the actual property owners. The date this occurs is known as the "transition date." It is customary in the planned community industry for the developer's rights and obligations to "sunset," typically after all the amenities have been constructed, most of the lots have been sold, and the transition date has occurred. Once transition occurs, the financial exposure to the developer is greatly reduced and the developer's focus is on selling its remaining lots.

[15] The Aldridges had become familiar with The Refuge and golf course because they became members of the golf club, played the golf course numerous times, had friends who lived in The Refuge, and hosted business clients, golf tournaments, and related events there. Also, Cindy Aldridge's mother worked at the golf shop for a period of time. In 2007, one of Zenn's managers, Peter Loyd, approached Jerry Aldridge about buying the golf course, but after considering the financials, the Aldridges declined at that time. The Aldridges eventually cancelled their golf membership; however, they continued to discuss with others the possibility of buying the course.

[16] The assignment was recorded on September 30, 2009.

### G. *Appellants Acquire the Golf Course*

**¶20** Meanwhile, the Aldridges had begun making plans to revive the golf club by replacing portions of the golf course with the Event Tent, RV Park, and related amenities, and in August 2009, they again entered discussions with Home Federal to acquire the golf course and country club property and the twenty-four lots Home Federal had acquired in foreclosure. Before purchasing the golf course property, City Center, through the Aldridges, had a full opportunity to conduct due diligence.[17]

**¶21** On September 30, 2009, City Center purchased the golf course and country club property, related assets, and twenty-four lots at The Refuge for $3.9 million. At the same time, Home Federal assigned its Declarant's rights to City Center. City Center also became the golf course owner as defined in the CC&Rs.[18]

---

[17] According to Appellants, Home Federal marketed the property to City Center as unencumbered by any use restrictions, and no residents of The Refuge told City Center there were any such restrictions. Appellants assert that, before closing on the purchase, they obtained a current title report and reviewed all recorded documents, including the zoning, the CC&Rs, the public report, the Final Plat, the land survey, and the County Resolutions relating to the property. They also assert they informed Home Federal and the County of their plan to build an upscale RV resort with amenities and that their due diligence uncovered no use restrictions prohibiting changes to the golf course.

[18] Jerry Aldridge testified in his deposition and at trial that "Jerry and Cindy Aldridge and Information Solutions and City Center are all the same entity." In late December 2011—in the midst of the subsequent litigation— City Center, as the golf club owner, transferred title to the golf club to the Aldridges personally, and the Aldridges subsequently transferred title to the golf course to Information Solutions, a company with no other apparent assets. According to Cindy Aldridge, the transfer to Information Solutions was effectuated because "the accounting was very confusing for our accountant and for the bank, [and] it was too difficult to tell what was happening with the rental properties and on the other developments that we had versus just The Refuge, so the banks wanted it separate and our accountant wanted it separate." On February 16, 2012, City Center recorded a "Partial Assignment of Declarant Rights" to Information

### H. Appellants' Redevelopment Plans

**¶22** After acquiring the property from Home Federal, the Aldridges, through City Center, sought to launch their redevelopment plan.[19] Aware that they would face "strong opposition to the trailer park concept," the Aldridges gave a formal presentation to homeowners at The Refuge on October 31, 2009, in an attempt to sway the owners to accept their plan. When the Aldridges announced City Center's plans to remove portions of the golf course for the RV Park and Event Tent, the Thienes Plaintiffs and other lot owners in The Refuge strongly and vocally opposed the plans, arguing that the proposed changes to the golf course were not consistent with what they had been promised by the original developers.

### I. Alleged Nuisance Caused by the RV Park and Event Tent

**¶23** Despite Plaintiffs' opposition and subsequent lawsuits, Appellants built the Event Tent and the first phase of the RV Park. Though not constructed when the lawsuits were filed in 2010, the Event Tent and RV Park were operational as of trial.[20]

**¶24** Appellants' construction and operation of the RV Park have had a negative impact on The Refuge community. Throughout the redevelopment, Appellants and their agents damaged the Association's

---

Solutions. City Center still owns twenty-three of the residential lots, and Information Solutions owns the golf club.

[19] At trial, Cindy Aldridge testified that she and her husband conceived of the "unique" redevelopment plan of building the RV Park inside the master-planned community while she was working on a paper for an MBA course, and while travelling with friends in a motorhome to an RV park in Indio, California. She also acknowledged that before buying the property from Home Federal, she had no prior experience in developing a master-planned community, with CC&Rs, or in managing a golf course or RV park. She also stated she believed she had not reviewed the County Resolutions before purchasing the golf course property, and she acknowledged the public report did not mention that an RV park could be included with the golf course.

[20] In 2012, the RV Park and related amenities lost over one million dollars.

gates, roads, and other property. Contrary to established rules and policies, Appellants instructed their construction vendors to use the south gate—rather than the north gate—for access.[21] In one instance, Appellants' steamroller, which had big cleats, caused indentations on the south entrance pavement, and the steamroller also took chips and chunks out of the curbing.

¶25 In addition to property damage, Appellants' construction and operation of the RV Park and Event Tent had a negative impact on the community in other ways. After the RV Park became operational, RV Park guests began using the south gate entrance area and Arnold Palmer Drive to get to and from the RV Park. The south gate entrance area and its adjoining roads were not designed to accommodate such large vehicles, and Appellants' business operations, including the Event Tent and RV Park, tended to overburden the Association's roads.

¶26 The RV Park has caused security concerns because customers enter the gated community and camp overnight, and as a result, some homeowners fear for their safety.[22] Also, construction and operation of the RV Park and Event Tent have caused an increase in trespassing and other criminal and offensive conduct in The Refuge. Further, with just phase one of the RV Park complete, the security and nuisance concerns are likely to

---

[21] The south gate of The Refuge community is the main entrance to Arnold Palmer Drive, the community, and the golf club entrance. To give a positive first impression as to the community, the south gate entrance area is comprised of cobblestone at the entry, has big stone columns on both sides, and has stamped concrete on the apron of the entry. The south gate entrance area is thus considerably more delicate, expensive, and fancy than the paving at the north gate, which is blacktop and better suited for heavy construction equipment or construction vehicles. From the inception of The Refuge community, construction traffic and heavier vehicles had always used the north gate, but Appellants refused to follow this practice.

[22] The Refuge is located adjacent to a high crime area; thus, security is very important to many of The Refuge's homeowners.

increase,[23] and Appellants were not providing adequate security to address the security issues caused by the RV Park and Event Tent.[24]

¶27        The Event Tent produced loud music and other distracting and bothersome noise.  Events held at the Event Tent occasionally caused parking and traffic problems in The Refuge.  As a result of the various activities and loud noise coming from Appellants' business operations, including the Event Tent and RV Park, the sheriff's office had been called to The Refuge on multiple occasions.

¶28        Both the RV Park and Event Tent are visible from many homeowners' lots, and the RV Park obstructs homeowners' views.  Thus, for various reasons, Appellants' construction of the RV Park and Event Tent have negatively affected the value of the homeowners' properties.

   II.    *Procedural History*

¶29        In an effort to prevent construction of the RV Park and the concomitant destruction of approximately thirty-eight acres of the golf course, the Thienes Plaintiffs filed a complaint and application for a temporary restraining order ("TRO") on July 16, 2010, against Appellants in Mohave County Superior Court Case No. CV2010-01563.  Appellants filed their answer and counterclaim on August 12, 2010.

¶30        In late September and early October 2010, the Association's Board adopted resolutions aimed at addressing the nuisance being created by Appellants.  On October 8, 2010, counsel for the Association sent a letter to counsel for City Center, advising that, beginning October 11, 2010,

> the Association [would] act to prohibit any entry of vehicles
> or persons on or over the Association's private roadways and
> Common Area easements, for purposes which are not directly
> related to the Golf Course and the Golf Club Facilities, which
> included non-golf-course uses including swimming pools,
> spas, tennis courts, an RV Park or Motor Home Park, non-golf
> related shows and activities and other such thing[s], also

---

[23]    Appellants' original plan regarding the RV Park was to have 350 spaces for RVs scattered across the golf course.

[24]    Cindy Aldridge acknowledged "having vandalism attacks on our property" and receiving a complaint from "Chuck" (Chuck Elias was one of the Association's security persons) about RV campers wandering into the homeowners' areas.

including without limitation, non-golf course social memberships, and the like.

¶31         On the morning of October 11, 2010, while the case with the Thienes Plaintiffs was pending, members of the Association's board attempted to enforce the CC&Rs by positioning themselves at the south gate in an effort to redirect Appellants' construction traffic to the north gate. Appellants maintained their easements pursuant to the CC&Rs were being abridged, and asserted that they could "drive when and where we want to" on the Association's roads.

¶32         On October 13, 2010, Appellants filed a complaint against the Association in Mohave County Superior Court Case No. CV2010-04163. Appellants also obtained a TRO from the trial court, prohibiting the Association from impeding Appellants' "construction, maintenance, and/or development" activities, based on their alleged easement rights under the CC&Rs. The trial court upheld the injunction on several occasions while Appellants worked on construction of their redevelopment, which included the shortened 6,200-yard golf course, the RV Park and resort, an expanded clubhouse, a swimming pool, and the Event Tent. Appellants also assert they constructed their own private road, enabling greater access to the RV resort.

¶33         The Association counter-claimed against City Center, alleging that City Center trespassed, breached a contract, and "overburdened" two easements by using the Association's roads to redevelop the property, and that City Center's activities constituted a nuisance. In the meantime, on January 26, 2011, the trial court consolidated Case Nos. CV2010-01563 and CV 2010-04163, and the Association joined the Thienes Plaintiffs' claims as a plaintiff. On February 16, 2011, City Center filed an amended complaint that included claims against the individual Board members. On June 21, 2012, the Thienes Plaintiffs filed an amended complaint.

¶34         Meanwhile, in 2012, while the consolidated matter was pending, the Association started a political action committee to bring another lawsuit, in which City Center intervened. *See Schilling v. Tempert*, 1 CA-CV 12-0505 EL, 2012 WL 4893221 (Ariz. App. Oct. 16, 2012) (mem. decision). The lawsuit arose out of the Association's efforts to mount a referendum to overturn the Mohave County Board of Supervisors' approval of City Center's RV Park permit. *See id.* at *1, ¶ 2. The Association asserted the County had previously imposed a golf-only zoning restriction on the property that prohibited the redevelopment, and that allowing the RV Park was an impermissible legislative act changing the existing zoning

classification as opposed to implementation of the existing zoning classification policy. *Id.* at \*1, ¶ 2, \*3-4, ¶¶ 16-17. The trial court rejected that claim, and this court affirmed. *Id.* at \*2, ¶ 9, \*6, ¶ 26. After *Schilling*, the trial court denied the parties' motions for summary judgment.

¶35 On April 15, 2013, the consolidated matter proceeded to a jury trial. At trial, Appellees maintained that use of the golf course property for an RV Park is inconsistent with the County's agreement with Sienna, the language of the County's Resolutions, the designated uses of the parcels within The Refuge as identified in the Final Plat, and the best interest of the residents who bought into the concept of the community.

¶36 Appellees also presented substantial evidence that Appellants' construction and operation of the RV Park and Event Tent have negatively impacted the community. Several of the Thienes Plaintiffs' witnesses testified about how their property value has been significantly devalued or made "absolutely worthless" by the change in use; however, they provided few specifics for the trial court to evaluate in determining whether they should be reimbursed for their loss. During closing argument, Appellees took the position that their case was not directly about money; instead, they argued the RV Park and the "lesser" golf course needed to be terminated, and the only remedy was to shut down the RV Park and return the golf course to its originally intended championship level.

¶37 On May 6, 2013, after sixteen days of trial, the jury rendered its verdicts, reaching a decision on twenty-one out of twenty-three possible verdict forms. Some of the verdict forms were binding and some were advisory. Although the weight of the jury verdicts clearly favored the respective positions presented by the Thienes Plaintiffs and the Association, the results were mixed. The Thienes Plaintiffs and the Association prevailed on their joint claims against Appellants for (1)[25] implied restrictive covenant, (2) express restrictive covenant, (3) equitable servitude, (5) breach of the covenant of good faith and fair dealing (awarding one dollar), (6) breach of contract - third-party beneficiary, (8)

---

[25] The numbering employed in this and subsequent paragraphs refers to the verdict form numbers.

private nuisance, and (10) quiet title.[26]  The Association prevailed on its claims against Appellants for (18) "misuse and overburdening" of the Declarant Easement, (20) nuisance, and (22) nuisance (Event Tent).[27]

¶38            Appellants prevailed on the Thienes Plaintiffs' and the Association's joint claims against them for (4) breach of contract,[28] (7) negligent misrepresentation, and (9) public nuisance, and on the Association's separate claims for (19) "misuse and overburdening" of the Golf Club Facilities easement and (21) trespass.

---

[26]      On Special Verdict Form 11, the jury found the Aldridges personally liable for any claims on which the jury found City Center and Information Solutions liable.

[27]      Additionally, the jury found against Appellants on Appellants' claims for (13) breach of contract against the Association, (14) tortious interference with business relations against Appellees and the individual defendants, (15) breach of fiduciary duty against the individual defendants, and (16) slander against the Association and the individual defendants. Those findings are not at issue in this appeal.

[28]      In its subsequent Findings of Fact and Conclusions of Law, the trial court correctly noted that "[t]he jury's binding verdict in City Center's favor on the breach of contract claim necessarily means the integrated lot purchase contracts (which incorporated by reference the CC&Rs) contained no restrictive covenant.  As a matter of law, an implied covenant cannot trump 'an integrated written contract for the sale of an interest in real property.'" *Shalimar Ass'n v. D.O.C. Enters., Ltd.*, 142 Ariz. 36, 43, 688 P.2d 682, 689 (App. 1984).  The court then noted, however, that this "is not how this jury interpreted the testimony and the facts," and further noted that "[t]he jury found [the Thienes] Plaintiffs bought the property with the expectation of it remaining the same and that [Appellants] had both an obligation and an opportunity to find out about these restrictions before purchasing their interest and beginning their development plan."  To the extent the trial court's findings and conclusions may be interpreted as indicating the court found such an implied restrictive covenant was incorporated into the written contract documents, and that Appellants violated that implied contractual covenant, such a finding was error. *See id.* However, any such erroneous finding and application of the law—if it exists—does not affect the resolution of the nuisance claims or our analysis of the injunctive relief granted in this matter.

¶39 The jury did not sign two advisory verdict forms: Verdict Form 12 would have recommended requiring Appellants to remove the RV Park and Event Tent and "restore the golf course to an Arnold Palmer Golf Course," and Verdict Form 17 would have recommended the court grant injunctive relief in favor of City Center and Information Solutions. Instead, on Verdict Form 23, the jury in its advisory capacity recommended injunctions limiting Appellants' further use of the Golf Course and Declarant Easements (effectively prohibiting Appellants' use of the Association's roads and related property to operate the RV Park and Event Tent) and against further use and development of the RV Park, but recommended against an injunction against hosting public events and concerts at the Event Tent. Consequently, although the jury only awarded Appellees $1 in damages out of the $16.2 million sought, it did recommend the majority of the injunctive relief sought by Appellees.

¶40 On December 17, 2013, the trial court issued lengthy and detailed findings of fact and conclusions of law, in which the court largely adopted the jury's findings and concluded that the recommended injunctive relief against Appellants was appropriate:

IT IS ORDERED enjoining City Center[29] from further use of the Golf Course Easement for anything other than golf or golf related facilities, which does not include an RV Park or an Event Tent; and

IT IS ORDERED enjoining City Center from further use of the Declarant Easement for anything other than selling or marketing of lots within the community owned by the Declarant.

IT IS FURTHER ORDERED enjoining City Center against further use and development of the RV Park.

¶41 In March 2014, the trial court entered final judgment, which included awards of attorneys' fees against Appellants totaling $2,358,755.19, plus taxable costs totaling $31,531.68.[30] Appellants timely

---

[29] The trial court clarified in its order that its references to City Center included all Appellants.

[30] In separate judgments, the court awarded attorneys' fees in the amount of $600,482.46, plus taxable costs in the amount of $15,844.83, to the

appealed, and we have jurisdiction over this consolidated appeal. *See* A.R.S. § 12-2101(A)(1) and (5)(b). *See also LaFaro v. Cahill*, 203 Ariz. 482, 484-85, ¶ 7, 56 P.3d 56, 58-59 (App. 2002) (stating that § 12-2101 "explicitly permits the appeal of injunctions").

## ANALYSIS

**¶42** Appellants argue that the trial court erred in its findings and legal conclusions and in ordering the three injunctions imposed. We have thoroughly reviewed the record and the briefs presented to this court on appeal, and we find no legal error or abuse of discretion in the trial court's decision to uphold/implement the jury's verdicts and order the injunctions.

*I.     Standard of Review and Legal Principles*

**¶43** In reviewing a jury's verdict, we view the evidence and reasonable inferences therefrom in the light most favorable to sustaining the verdict. *See, e.g., Romero v. Sw. Ambulance*, 211 Ariz. 200, 202, ¶ 2, 119 P.3d 467, 469 (App. 2005). In our review, we search the record "for a reasonable way to read the verdicts as expressing a coherent view of the case." *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 39, 945 P.2d 317, 350 (App. 1996) (citation omitted). In general, we will affirm a verdict if substantial evidence supports it. *Flanders v. Maricopa Cty.*, 203 Ariz. 368, 371, ¶ 5, 54 P.3d 837, 840 (App. 2002).

**¶44** "An injunction may serve to undo accomplished wrongs, or to prevent future wrongs that are likely to occur." *TP Racing, L.L.L.P. v. Simms*, 232 Ariz. 489, 495, ¶ 21, 307 P.3d 56, 62 (App. 2013) (citations omitted); *see also Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Ariz.*, 148 Ariz. 1, 10, 712 P.2d 914, 923 (1985) (recognizing that a lawful business may still be enjoined, and affirming an injunction prohibiting a church from operating a free food distribution program, despite remedial efforts by the church, because the program had caused an increase in trespassing and criminal activity, and otherwise constituted a nuisance to a neighboring community's homeowners); *Burton v. Celentano*, 134 Ariz. 594, 597, 658 P.2d 247, 250 (App. 1982) (affirming a preliminary injunction requiring the removal of a wall diverting water); *McQuade v. Tucson Tiller Apartments, Ltd.*, 25 Ariz. App. 312, 315, 543 P.2d 150, 153 (1975) (affirming an injunction prohibiting a neighboring shopping center from holding

---

Association, and attorneys' fees in the amount of $1,758,272.73, plus taxable costs in the amount of $15,686.85, to the Thienes Plaintiffs.

concerts due to the accompanying loud music, noise, parking problems, trespassing, and other annoyances).

¶45    We generally review a trial court's decision to grant injunctive relief for an abuse of discretion. *Flying Diamond Airpark, LLC v. Meienberg*, 215 Ariz. 44, 47, ¶ 9, 156 P.3d 1149, 1152 (App. 2007). Although we defer to the court's findings of fact unless they are clearly erroneous, we review *de novo* the court's legal conclusions, including the interpretation of a contract. *See id.*; *Powell v. Washburn*, 211 Ariz. 553, 555, ¶ 8, 125 P.3d 373, 375 (2006).

¶46    Because CC&Rs constitute a contract between property owners as a whole and individual property owners, we review *de novo* the interpretation of CC&Rs. *Cypress on Sunland Homeowners Ass'n v. Orlandini*, 227 Ariz. 288, 297, ¶ 31, 257 P.3d 1168, 1177 (App. 2011). In interpreting CC&Rs, we read the language used in its ordinary sense, construing it in light of the circumstances surrounding its formulation, and with the idea of carrying out its object, purpose, and intent. *Id.* (citing *Powell*, 211 Ariz. at 557, ¶ 16, 125 P.3d at 377). "We are not bound by the 'strict and technical meaning of the particular words' in the declaration." *Id.* (citing *Powell*, 211 Ariz. at 556, ¶ 10, 125 P.3d at 376). Instead, "'the function of the law is to ascertain and give effect to the likely intentions and legitimate expectations of the parties' who create the covenants." *Saguaro Highlands Cmty. Ass'n v. Biltis*, 224 Ariz. 294, 296, ¶ 6, 229 P.3d 1036, 1038 (App. 2010) (quoting *Powell*, 211 Ariz. at 556–57, ¶ 13, 125 P.3d at 376–77). There is no dispute that the CC&Rs were created by Sienna/Zenn, the developer of The Refuge, who is referred to as the Declarant in the CC&Rs. Thus, in interpreting the CC&Rs, the question is the intent of Sienna/Zenn, the Declarant. *See id.*

¶47    As with CC&Rs, principles of contract interpretation also apply to easements. *IB Prop. Holdings*, 228 Ariz. at 66, ¶ 16, 263 P.3d at 74. The parol evidence rule prohibits the admission of extrinsic evidence to vary or contradict the terms of a contract, but such evidence is admissible to interpret those terms and explain what the parties truly may have intended. *Id.* (citing *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993)). Although a court should consider the evidence once proffered, the court retains discretion to determine if the contract language is "reasonably susceptible" to the interpretation offered by its proponent, and then should limit its use to determining the parties' intended meaning. *See id.* (citing *Taylor*, 175 Ariz. at 154, 854 P.2d at 1140). "When the provisions of the contract are plain and unambiguous upon their face, they must be applied as written, and the court will not pervert or do violence to the language used, or expand it beyond its plain and ordinary meaning or add something to the contract which the parties have not put

there." *Id.* at 66-67, ¶ 16, 263 P.3d at 74-75 (citations and internal quotations omitted).

> II. *The Injunctions Relating to the Easements*

> A. *The Golf Club Facilities Easements*

¶48 As part of its verdicts, the jury found Appellants prevailed on the Association's claims for misuse and overburdening of the Golf Club Facilities Easements. Nevertheless, the jury recommended an injunction limiting Appellants' further use of the Golf Course Facilities Easements.

¶49 The trial court found that, in granting the Golf Club Facilities Easements in the CC&Rs, Sienna did not intend those limited easements to facilitate constructing, using, or operating an RV Park or Event Tent. Instead, Sienna's purpose, as noted by the court, was to enable the golf club owner to maintain the golf club:

> When the developer created easement rights in favor of the Declarant over the Association's property, the developer did not intend for the Declarant's easements to be used for the construction of an RV Park.

> The intent of the developer in creating the golf course facilities easements was to allow the golf course owner to do maintenance work, for example, if one of the bunkers goes out of place, you can repair it or if somebody dug up the tee box. It was intended for the purpose of maintaining the golf club.

The trial court enjoined Appellants "from further use of the Golf Course Easement for anything other than golf or golf related facilities, which does not include an RV Park or an Event Tent."

¶50 In construing the easements and making its determination, the trial court relied in part on parol evidence—most specifically, the testimony of John Hankinson, Sienna's principal—"to clarify and explain the CC&Rs and to help determine the intent of the parties." *See Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 212 Ariz. 381, 384, ¶ 12, 132 P.3d 825, 828 (2006) ("Under Arizona's parol evidence rule, [w]here . . . an ambiguity exists on the face of [a] document or the language admits of differing interpretations, parol evidence is admissible to clarify and explain the document. The court may also admit evidence to determine the intention of the parties if the judge . . . finds that the contract is reasonably susceptible

to the interpretation asserted by its proponent." (internal quotations and citations omitted)).

**¶51** Even without consideration of such evidence, however, our *de novo* review of the language of the Golf Club Facilities Easements convinces us the court did not err. The several subparagraphs of ¶ 4.5 of the CC&Rs provide for the Golf Club Facilities Easements. Read as a whole, and in conjunction with CC&R ¶ 1.20, which defines the terms "Golf Club Facilities" and "Golf Course," these subparagraphs clearly contemplate uses associated with and related to the operation, maintenance, repair, and use of the golf course by the golf course owner and its agents, as well as use of the course by golfers. The language does not appear to contemplate non-golf-related uses, and even an expansive reading of the language of these easements does not reasonably support an interpretation that includes a motor coach RV Park or concert Event Tent as part of the golf course or golf-related Golf Club Facilities. Read in their ordinary sense, the object, purpose, and intent of these subparagraphs was to further the developer's intent of supporting and using the golf course. Accordingly, we find no ambiguity in the plain language of these subparagraphs of the CC&Rs. Moreover, to the extent there is any ambiguity in the language of the Golf Course Facilities Easements, the parol evidence introduced at trial fully comports with the most reasonable interpretation of that portion of the CC&Rs, was not used to vary the terms of the CC&Rs, and supports the trial court's decision. The trial court's reliance on such evidence was not an abuse of discretion, and the court did not abuse its discretion in enjoining Appellants' use of the Golf Course Facilities Easements to the uses specifically contemplated by those easements.

### B. The Declarant's Easements

**¶52** The jury found the Association prevailed on its claim against Appellants for misuse and overburdening of the Declarant's Easements. Further, the jury recommended an injunction limiting Appellants' further use of the Declarant's Easements.

**¶53** The trial court found that, when Sienna granted easements to the Declarant over the Association's roads via the CC&Rs, Sienna did not intend for these easements to facilitate constructing or operating an RV Park. Accordingly, the trial court enjoined Appellants "from further use of the Declarant Easement for anything other than selling or marketing of lots within the community owned by the Declarant."

¶**54**      Our *de novo* review of the language of the Declarant's Easements convinces us the court did not err.  The Declarant's Easements are provided for in the subparagraphs of ¶ 5.3 of the CC&Rs.  Read in context and in conjunction with ¶ 1.42, these limited easements allowed the developer (Sienna/Zenn) and its assigns "to maintain sales or leasing offices, management offices and models throughout" the community property (which did not include the golf course or golf-related facilities) while developing and marketing The Refuge community.  The easements also allowed the developer to do such things as place advertising signs in common areas, restrict parking for the purpose of marketing unsold home lots, and use property owned by the Declarant to maintain, repair, and construct improvements in common areas and lots owned by the Declarant.  Nothing in the language of the Declarant's Easements provides for the Declarant or its assigns to use or access the golf course or golf club property.  Moreover, in reading the CC&Rs as a whole, we conclude that once the developer turned the common areas over to the Association on the transition date, *see* ¶ 1.46, the only remaining purpose of the Declarant's Easements was to allow the developer or its assigns access to sell any remaining unsold home lots.  We find no ambiguity in the plain language of these subparagraphs of the CC&Rs, and even assuming *arguendo* some ambiguity exists, the parol evidence introduced at trial fully supports the trial court's findings and conclusions, and our interpretation of that portion of the CC&Rs.  The trial court's reliance on such evidence was not an abuse of discretion, and the court did not abuse its discretion in enjoining Appellants' use of the Declarant's Easements to the uses specifically contemplated by those easements.[31]

### III.    *The Injunction Related to the RV Park*

¶**55**      The jury found Appellees prevailed on their joint claims against Appellants for private nuisance, and the Association prevailed on its claims against Appellants for private nuisance and nuisance (Event Tent).[32]  The jury did not sign advisory Verdict Form 12, which would have

---

[31]      Further, even if the language of the Declarant's Easements and Golf Club Facilities Easements could somehow be construed as allowing Appellants and their visitors access to the RV Park and Event Tent, substantial evidence presented at trial supports the conclusion that the trial court's easement injunctions could still be upheld based on the resultant nuisance activity surrounding those uses.

[32]      As previously recognized, however, Appellants prevailed on Appellees' joint claims for public nuisance.

recommended requiring Appellants to completely remove the RV Park and Event Tent and fully restore the golf course to its previous condition. Further, as part of Verdict Form 23, the jury in its advisory capacity recommended against an injunction prohibiting hosting public events and concerts at the Event Tent, but recommended an injunction against further use and development of the RV Park.

¶56 After considering the evidence presented at trial and the jury's verdicts, the trial court found that Appellants' development and continued use of the RV Park and Event Tent constituted nuisances:

> The Association Parties proved that City Center, by acting or failing to act, created a condition or permitted a condition to exist that is offensive to the senses or an obstruction to the free use of property that interferes with the comfortable enjoyment of life or property; that City Center created a condition that affected a substantial amount of people at the same time; that an ordinary person would be reasonably annoyed or disturbed by the condition; that the condition causes harm that is different from the type of harm suffered by the general public; and the condition is a substantial factor in causing the harm.

> City Center's business operations, including the RV Park and proposed changes to the Golf Course to accommodate the RV Park constitute a nuisance. (See Verdict Form 20).

> City Center's business operations on the golf course, including the Event Tent, City Center's use of the Event Tent, City Center's proposed changes to the Golf Course to accommodate the Event Tent and the parking issues on the Association's property caused by events held at the Event Tent all constitute separate and distinct nuisances. (See Verdict Form 22).

After considering the jury's recommendations, the trial court enjoined Appellants "against further use and development of the RV Park."

¶57 The trial court's conclusions and decision to order injunctive relief based on nuisance are fully supported by the evidence presented at trial, the jury's verdicts, and the court's own findings. Also, the court's December 17 ruling makes clear the court carefully considered the jury's advisory verdicts and recognized it was not constrained by those verdicts.

Further, contrary to Appellants' representations, the court considered Appellants' argument that injunctive relief was inappropriate and weighed the utility of that relief against the burden. Rather than rely on contract terms or an implied covenant to enjoin the continued use and development of the RV Park, the court relied on the substantial evidence supporting the conclusion that Appellants' use of the RV Park constituted a nuisance. Moreover, rather than enjoining Appellants' entire business, the court fashioned a compromise remedy that allowed Appellants to continue to operate their Event Tent despite evidence and the court's conclusion that Appellants' use of the Event Tent also constituted a nuisance. The court's decision to enjoin the RV Park was based on its implicit conclusion that the RV Park constituted a greater nuisance and implicated greater security concerns for homeowners and the Association. The court noted that Appellants (and their agents and visitors) had consistently misused the easements and failed to follow the Association's rules, and had failed to provide adequate security, despite the trespassing and other problems created by their business.[33] The court also noted "the existence of the RV Park has affected the 'value' of the original purchasers' lots," and concluded that "further expansion of the RV Park is untenable." Substantial evidence supports the court's findings and conclusions, and we find no abuse of discretion in the court's decision to enjoin Appellants' further use and development of the RV Park.[34]

### IV. The Trial Court's Award of Costs and Attorneys' Fees

**¶58** In their consolidated appeal, Appellants challenge the trial court's awards of attorneys' fees and costs to Appellees, and that Jerry and Cindy Aldridge are personally liable for such expenses. Appellants first maintain the court erred by finding the Aldridges personally liable for the conduct of their business entities because insufficient evidence was presented to pierce the corporate veil – most specifically, evidence that City

---

[33] Moreover, although the RV Park might not be a prohibited use of Appellants' property under the County's zoning restrictions, substantial evidence was presented that it does not comport with the nature and character of the community, or the intent of the original developer and lot owners.

[34] In their briefing, Appellants contend that the injunctive relief provided by the court was inappropriate, and argue that the availability of money damages was a sufficient remedy. We reject this argument, noting that, at all material times, Appellees consistently sought injunctive relief, not money damages.

Center and Information Solutions were the alter ego of the Aldridges and that observance of the businesses' separate legal status would sanction a fraud or permit injustice. *See, e.g., Cammon Consultants Corp. v. Day*, 181 Ariz. 231, 233, 889 P.2d 24, 26 (App. 1994) (citing *Emp'rs Liab. Assurance Corp. v. Lunt*, 82 Ariz. 320, 323, 313 P.2d 393, 395 (1957) (recognizing that a corporate fiction will be disregarded upon the concurrence of two circumstances: (1) when the corporation is, in fact, the alter ego of an individual or a few individuals, and (2) when the observance of the corporate form would sanction a fraud or promote injustice)).

¶59       As we have previously noted, on Special Verdict Form 11, the jury found the Aldridges personally liable for any claims on which the jury found City Center and Information Solutions liable. The trial court adopted that advisory finding, and concluded as follows:

> Jerry and Cynthia Aldridge were and continue to be the controlling owners and managers of City Center and Information Solutions and control the foregoing entities so that they have no separate mind, will or existence. Jerry and Cynthia Aldridge used said control to violate a positive legal duty and commit an unjust act in violation of Plaintiffs' rights, which violations and acts are the proximate and direct cause of Plaintiffs' injuries. Therefore, disregarding the entities' separate legal status is necessary to prevent injustice.

¶60       We find no error. Appellants do not contend and the record does not indicate the jury was improperly instructed on the applicable law regarding piercing the corporate veil. Having been properly instructed, it was entirely within the province of the jury to answer the advisory question submitted to it. We decline to vacate that verdict or the subsequent finding by the court, both of which are supported by substantial evidence and reasonable inferences therefrom, including but not limited to the Aldridges' own testimony.[35]

---

[35]       We also reject Appellants' argument that the court erred in finding the Aldridges personally liable for the Association's costs and attorneys' fees as well as those of the Thienes Plaintiffs. Appellants acknowledge "the Association joined the Thienes Plaintiffs' claims as part of the consolidation below," and the record is clear that the trial court granted the Association's motion to intervene as a plaintiff in the Thienes Plaintiffs' case. Moreover, even were we to construe the jury's advisory finding on Special Verdict

**¶61** In deciding to award costs and attorneys' fees to Appellees, the trial court concluded Appellees were the prevailing parties both on their claims against Appellants and on Appellants' claims against them. That is substantially correct; however, the court further concluded that the claims in the matter arose out of contracts and covenants, express and implied, including the CC&Rs,[36] and as the overall prevailing parties, Appellees were entitled to their attorneys' fees pursuant to A.R.S. § 12-341.01. This finding appears contrary in part to the jury's verdict in favor of City Center on Appellees' breach of contract claim, and we have previously noted that, to the extent the court apparently adopted the jury's additional verdict finding the existence of an implied restrictive covenant, the court erred. *See supra* note 27, at ¶ 38. For this reason, and for the reasons mentioned below, we remand the issue of the costs and attorneys' fees awards to the trial court for recalculation.

**¶62** Appellants also raise numerous other challenges to the awards, arguing that many of the costs and fees awarded were not properly recoverable as costs or attorneys' fees, unrelated to the case, supported by vague documentation, etc. It appears several of Appellants' arguments in this regard may be correct; however, in light of our decision to remand the awards as noted above, we do not analyze these additional challenges, but trust that on remand the trial court will carefully review Appellees' requests for costs and fees, and properly consider the objections raised by Appellants in its recalculation of the awards. *See, e.g., Ahwatukee Custom Estates Mgmt. Ass'n v. Bach*, 193 Ariz. 401, 402-04, ¶¶ 6-12, 973 P.2d 106, 107-09 (1999) ("Allowing a party to recover non-taxable costs under the guise of attorneys' fees would undermine the legislative intent expressed in A.R.S. § 12-332."). Similarly, with respect to Appellants' argument on appeal that the awards did not identify the applicable interest rate, such issue can be clarified by the trial court on remand.

---

Form 11 in the limited manner advocated by Appellants (which we do not), that finding did not preclude the court from holding the Aldridges personally liable. *See generally Wooldridge Constr. Co. v. First Nat'l Bank of Ariz.*, 130 Ariz. 86, 88, 634 P.2d 13, 15 (App. 1981) (recognizing that a trial court is not bound by an advisory jury's findings).

[36] As we have recognized, CC&Rs constitute a contract between property owners as a group and individual property owners. *See Cypress on Sunland Homeowners Ass'n*, 227 Ariz. at 297, ¶ 31, 257 P.3d at 1177.

*V.     Costs and Attorneys' Fees on Appeal*

**¶63**          Appellants and Appellees request costs and attorneys' fees on appeal pursuant to A.R.S. §§ 12-341, 12-341.01, and 12-342, and Rule 21, ARCAP.[37]  Appellants also cite ¶ 4.11 of the CC&Rs.  In our discretion, we award taxable costs and an amount of reasonable attorneys' fees on appeal to Appellees, contingent upon compliance with Rule 21, ARCAP.

## CONCLUSION

**¶64**          The trial court's orders granting injunctive relief are affirmed. The trial court's awards of costs and attorneys' fees are vacated, and the matter is remanded for a recalculation of those awards.



AMY M. WOOD • Clerk of the Court
FILED:   AA

---

[37]     Rule 21, ARCAP, is a procedural rule that does not provide a substantive basis for an award of attorneys' fees. *See Tilley v. Delci*, 220 Ariz. 233, 239, ¶ 19, 204 P.3d 1082, 1088 (App. 2009) (citation omitted).